UNITED STATES of America, Appellee,

v.

Roland Wesley WEBER et al.,
Defendants, Appellants.

Nos. 80–1533 to 80–1540.

United States Court of Appeals,
First Circuit.

Argued April 9, 1981.

Decided Sept. 30, 1981.

As Amended Oct. 5, 1981.

Rehearing Denied Dec. 28, 1981.

Philip A. DeMassa, San Diego, Cal., with whom Patricia S. O'Mara, San Diego, Cal., was on brief, for defendants, appellants.

Margaret D. McGaughey, Asst. U. S. Atty., Portland, Maine, with whom Thomas E. Delahanty, II, U. S. Atty., and James W. Brannigan, Jr., Asst. U. S. Atty., Portland, Maine, were on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

ALDRICH, Senior Circuit Judge.

Defendants Weber, Strimpel, Samsel, Mark Tice, Lewis, McDougal, Michael Tice, and Jackson were indicted, *inter alia*, for conspiracy to import, and to possess with intent to distribute, hashish in violation of 21 U.S.C. §§ 846 and 963. After commencement of a jury trial, defendants and government counsel entered into an agreement, approved by the court, to the following effect. Defendants would waive trial by jury and would submit to trial by the court upon certain agreed facts and the testimony and exhibits which defendants had unsuccessfully moved to suppress before trial, and would stipulate that the evidence was sufficient to charge every defendant, but reserving the right of appeal from the court's refusal to suppress. In return, the government agreed to dismiss the substantive counts, and to recommend certain sentences on the conspiracy count. Thereafter defendants were found guilty, and they appeal.[1] No other errors are asserted. Because in two respects the motions to suppress should have been granted, we reverse, in part, as to four defendants, but otherwise affirm.

In connection with its action on the motions the court issued an extensive memorandum opinion, reciting the facts found as a result of an evidentiary hearing, together with its legal conclusions. Since this memorandum was not published, we will (a) summarize somewhat, but quote extensively therefrom;[2] (b) note certain "facts" asserted by defendants, and their incorrectness; (c) summarize and supplement the district court's rulings, and (d) deal with the two items, a walkie-talkie and a chart, that, as to some defendants, should have been suppressed.

*The Facts*

The operative events occurred on and near Little Machias Bay, Maine, on December 12 and 13, 1978.[3] The bay, as shown on the Loran-lined edition to U.S. C. & G.S. chart No. 1201 in evidence[4] is in reality a cove, ⅝ mile wide. It faces south, viz., the ocean, is open and exposed, and is without wharves or other facilities. Lying centrally off the bay, in deep water, are two small islets, known as Black Ledges. Two and a half miles to the east is the town of Cutler, with an excellent anchorage, and twenty miles to the east is the Canadian border. Two miles to the west, but cut off from it by islands and a point of land, is Machias Bay and a Naval pier and twenty miles to the west is the U.S. Coast Guard station at Jonesport.

The easterly side of Little Machias Bay terminates at Dennison Point. The Point is sparsely housed, partly cleared and partly wooded. At the end of the road, and fronting on Bear Cove, a small inlet from the bay, are a large house and outbuildings known as Hill Cottage. Coastal Warden MacKeen resided 200 yards inland from the Cottage. Other persons resided further back.

The cast of characters begins, however, with Special Agent Cunniff, of the U.S. Drug Enforcement Administration, and Trooper Watkins, of the Maine Division of Special Investigations who worked in concert with him. During the late summer and fall these officers became interested in a Dodge Power Wagon 4 wheel drive pickup

---

1. Seemingly the court imposed less than the agreed to sentences, most likely because of *Bifulco v. United States*, 1980, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205, but none of this is clear on the record.

2. All quotes in this opinion, unless obviously otherwise, are from the court's memorandum.

3. Defendants' objections to a warrant-supported search on December 14 are too frivolous to require discussion.

4. The ship's copy of this chart, Exhibit 8, containing certain private markings, was unlawfully seized, post. However, the chart itself is a standard government publication in such common use that under principles of judicial notice we will refer to it, minus the markings. It would be in no way significant, or improper, for the vessel to have an unmarked copy of this chart aboard, and there is no prejudice in this limited use.

truck with a covered camper cap, and a Chevrolet K–5 Blazer, both Maine registered, but with undiscoverable owners. The handwriting on both sets of purchase documents appeared similar, and both vehicles were seen at times on the Hill Cottage property. The Cottage had been purchased the year before by one Melrose, whose only mailing address was a Boston answering service, and who had never been seen. The property was currently occupied by a Lou and Linda Walker, the former proving ultimately to be defendant Weber. Weber told neighbors that he was a Nebraska carpenter who had answered an advertisement to occupy as a caretaker, and was leaving shortly.

The above facts, together with many others properly found by the court, showed a classic example, shoreside, of a drug smuggling set-up, and the court so finding cannot be faulted. On December 12, 1978 the ocean activity commenced. The night was clear and calm, with a bright moon. At about 9 P.M. another coastal warden, Allen, called MacKeen's attention to

"a large black and white boat, later identified as the 135-foot seagoing tug Tusker of Panamanian registry, with its lights out, lying about a half mile off the point on the inland side of Black Ledge.... The boat's engines ran intermittently to maintain its position behind the ledge. While Allen continued to watch the boat, MacKeen returned to his house and notified the Coast Guard and the Maine State Police.

.    .    .    .    .

"[A]t 9:35 p.m. the Coast Guard station at Jonesport dispatched a 41-foot patrol boat under the command of Petty Officer Paul E. Laurent. Shortly thereafter, the 82-foot cutter Point Hannon was underway. By 10:33 p.m. the patrol boat had arrived in the area. Laurent had been instructed to remain out of sight behind an island, but by mistake he overshot the island and fell dead in the water at the mouth of Little Machias Bay. In that position the patrol boat was silhouetted against the sky and Laurent suspected that he had been seen in the bright moonlight. Laurent could see the Tusker without its lights on but could discern no details."

Shortly before this another coastal warden, Fetterman "had observed a small boat, later determined to be a Zodiac inflatable rubber boat with a 15-horsepower outboard motor, operating without lights, with two occupants, come out of Little Machias Bay around Dennison Point and proceed to the Tusker. About five minutes later Fetterman saw the Zodiac, still without lights and with two occupants, depart the Tusker and head directly into Bear Cove. As the Zodiac was approaching the cove, the Coast Guard patrol boat turned on its lights and started toward the Tusker. Fetterman, and Cunniff and MacKeen, who had arrived at the shore, saw the Zodiac change its course and head toward the wooded area to the east of Bear Cove. After proceeding about 100 yards, it stopped briefly and something was thrown overboard.[6] The Zodiac then moved into shore between two ledges, where the officers lost sight of it. They heard noises in the bushes which they took to be the occupants of the boat working their way through the underbrush. A few minutes later the Zodiac floated out from between the two ledges.[7]

"Fetterman, Cunniff and MacKeen went to the spot where the Zodiac had landed. There they found two sets of tracks beginning at the snow line marking the reach of high tide. Alongside the tracks they found a canvas bag. Cunniff searched the bag, which contained, along with food and camping supplies, two sheets of yellow legal paper listing supplies and equipment and including the notations 'Mac' and 'blue p/u.' Cunniff returned to MacKeen's house. MacKeen and Fetterman set off to follow the tracks in the snow. After about 20 minutes at the end of the tracks, at a point where the underbrush impeded further progress, they found two men lying in sleeping bags. MacKeen and Fetterman arrested them for operating a boat with-

out lights at night. *See* 12 Me.Rev.Stat. Ann. § 2074. The two men identified themselves as defendants Weber and Strimpel. MacKeen asked Weber if he was not 'Lou Walker,' but Weber insisted his name was Weber. The two men were searched, and a Zodiac air pressure gauge was found on Weber."

---

"[6] Divers later recovered a box containing radio equipment from the approximate location.

"[7] Later that night, a small boat from the Point Hannon found the Zodiac almost swamped floating off the coast with the plugs along one side pulled and the air compartments along that side deflated."

Strimpel and Weber were taken to Machias and formally arrested for violation of the federal narcotics laws.

"In the meantime, the boarding party from the Coast Guard patrol boat, led by Petty Officer Laurent, had boarded the Tusker at about 11:00 p. m. As they approached the vessel, the party had noted that she was flying a foreign flag. Only three persons were found aboard: defendant Samsel, who identified himself as the master, and defendants Mark Tice and Lewis. Samsel stated that they had been en route from Norfolk, Virginia, to Nova Scotia and had pulled into Little Machias Bay because of a bad winter storm and mechanical difficulties with the steering and electrical systems. He produced the vessel's Panamanian registration, which named 'Ocean Survey and Study, Ltd.' as the owner and gave a California telephone number.[9] The boarding party copied the information they wanted from the registration and the crew's seamen's papers. Laurent and another member of the boarding party, accompanied by Samsel, then searched the vessel for marijuana bales. None were found.... No arrests were made, no [physical] evidence was taken, and the vessel was not seized. Samsel, however, stated that the Tusker needed to get into a port for repairs, and at his request the Point Hannon, which had arrived at about 11:15 p. m., escorted the Tusker into the Cutler Naval Station, where both vessels tied up at the Navy pier.

"Early the next morning, at about 6:00 a.m., Cunniff, accompanied by Vittum, MacKeen and two coastguardsmen, went to the Cutler Naval Station. Cunniff boarded the Tusker and opened the hatch leading to the main cabin. Without entering, he asked if anyone was there. He was answered by Samsel, who said, 'Come on in' and led the officers to the mess hall. Cunniff identified himself and those with him and asked Samsel to get the other two crewmembers, which he did. When all three—Samsel, Mark Tice and Lewis—were assembled in the mess area, Cunniff placed them under arrest for conspiracy to violate the federal narcotics laws, and he told them that the vessel was seized under 21 U.S.C. § 881. He then read them their rights from his *Miranda* card, omitting, however, the final question of whether they wished to waive their rights. Each defendant individually acknowledged that he understood each of his rights. After informing defendants of their rights, Cunniff did not 'interrogate' or 'question' them, but told them to go to their quarters and collect their personal belongings. Each defendant then went to his cabin, accompanied by an officer, and collected his belongings. While still aboard the boat, Samsel stated to Cunniff that the Tusker had come from Singapore; that her last port of call had been Norfolk; and that they had had mechanical difficulties and he was concerned about traveling further without repairs. Lewis said the Tusker had had water and heating problems. When Cunniff asked Lewis what he did, Lewis stated that he was the boat's bursar, that he was a retired Navy jet pilot, and that he had not thrown anything overboard. Mark Tice stated that he was the engineer of the boat and that he did not know where they had been, where they were going, or why they were in Maine, because he spent so much time below deck. He also stated that Samsel would obtain instructions by calling the managing company, Ocean Research. The three defendants were then driven to

the Washington County Sheriff's office in Vittum's car. On the drive to Machias, Samsel stated that Michael Tice and Jackson had been on the boat and had left two days earlier in a Zodiac with a 15-horsepower engine.[10]

"[9] A check by the Coast Guard later that night disclosed that the California number was that of an answering service."

Footnote 10 reads as follows.

"10. Before leaving the Tusker, Cunniff seized 6–10 charts and a clipboard with paper, which he found on a table in the wheelhouse. He also seized money and some personal papers from the crewmembers and some personal items from the living quarters."

This seizure included the 1201 chart, Exhibit 8.

Later Michael Tice and Jackson were stopped in a blue pickup driven by McDougal and arrested, and after some conversation McDougal was also arrested.[5]

"The three defendants and the truck were taken to the Federal Building in Bangor, where the men were taken to the jail facilities and the truck was parked and locked in the garage. The men were only questioned to the extent necessary for booking. The truck was returned to the rental agency. Prior to doing so, Drinan removed the tires and rainslicker from the truck. In the Marshal's office he found a walkie-talkie radio rolled up in the slicker.[12] During the booking of McDougal, Drinan asked if there was anything that McDougal wanted to recover from the truck before it was returned to the agency. McDougal said he wanted the aluminum case in the front seat, which was his and which contained expensive photographic equipment. Drinan retrieved the case. He then asked McDougal to give him a receipt itemizing the camera equipment. McDougal

opened the case and Drinan removed each item, listing each on a receipt, which McDougal signed. While doing this, Drinan noticed a bulge in the foam lining of the case which was not glued in place. From behind the lining he removed a kitchen knife, a manila envelope, and three topographical maps of the Dennison Point area that had been folded to fit together. He opened the manila envelope, which was not sealed, and found two sealed envelopes addressed to a Michael Panier, San Diego, California.[13] The items found behind the foam lining were seized by Drinan.

"Over the next three days, 16 metal canisters, each measuring approximately 10″ by 10″ by 20″ containing hashish, and weighing between 50 and 75 pounds each, were found in various shore and sea areas in the vicinity of Little Machias Bay and Cutler Harbor. Two more canisters were found in March 1979 on Deer Island, about a mile east of Bear Cove in Little Machias Bay. The first eight canisters were found by a fisherman on the morning of December 13, but the officers did not learn of the discovery until after all the defendants had been arrested. The canisters were seized and opened by the government without warrants.

"On December 14 Steadman executed a search warrant issued by a United States Magistrate for the Tusker. No hashish or other contraband was found, but Steadman seized navigational equipment, charts and other papers.

"[12] It has been stipulated that Jackson was the owner of the yellow rainslicker and radio.
"[13] The two sealed envelopes were later opened pursuant to a search warrant secured by Steadman. Some film was also seized and developed pursuant to a warrant."

*The Fantasies* (Quotations are from defendants' brief.)

I. The Tusker was a "damaged ... vessel [that] sought refuge in a small town's

5. In this connection the court found, "At the time he began his questioning, Drinan did not intend to arrest McDougal. He had been informed of Samsel's statement that Jackson and Tice had been on the Tusker, but, although suspicious, he realized that he had no specific

information linking McDougal to the vessel. He was, however, aware of the notations 'Mac' and 'blue p/u' (taken by Drinan to mean 'pickup'), on the list found in the canvas bag on the shore."

harbor," elsewhere referred to as "Little Machias Harbor."

In fact, there was no town. Little Machias Bay was neither a harbor nor an appropriate place of refuge, particularly in light of the proximity of Cutler Harbor, unless a vessel had lost all possibility of movement. This was conspicuously not the case. The reason the Tusker appeared not to have cabin lights was because her ports had been shielded with foil.

II. "Mechanical difficulties and inclement weather necessitated the stop in Little Machias Bay."

If there had been inclement weather, it was over. It was undisputed that it was a "very calm night."

III. The actions of the Zodiac's crew were "innocuous and consistent with the behavior of a concerned neighbor motoring out to offer assistance to a distressed vessel." They "motored out to inquire ... since their vessel appeared to be in distress."

Viewed from the shore the only conceivable sign of distress was that the vessel was without lights—surely not enough to evoke sizable concern from local residents, even the most generous minded. Moreover, the Zodiac was not known to belong to any resident, the bay being without boats, wharves, or other facilities.

.IV. The Tusker was a "marginally operable vessel" and it could not be inferred that she "had crossed the border ... since the nearest border is at least 100 miles north of Little Machias Bay, and not within [her] range."

The Tusker was a 135′ ocean going tug. At the original boarding Samsel, as master, stated they were en route from Norfolk, Virginia to Nova Scotia. The Canadian border was 20 miles, not 100 miles, distant. Moreover, as counsel must know, since they cite United States v. Zurosky, post, the relevant border is between territorial and international waters. In this instance this was some 3½ miles.

V. "It was not controverted that there were other vessels present that evening from which it is just as likely that the contraband originated ...."

It was not "controverted" because there was no evidence of any other vessels, likely sources or otherwise.

That counsel, not inadvertently during oral argument, but deliberately, in a brief, should make such unsupported statements of purported fact raises serious disciplinary questions in our minds. At the least, it means that we must seriously question defendants' brief from cover to cover.

*Summary*

In sum, there was no apparent reason for the Tusker to be where she was, when she was, or for the Zodiac to put out to her, except as a drug or other smuggling operation; drugs being the most likely. Even on the most innocent view, the Zodiac was operating illegally without lights, as it cannot be said that, coming from the shore, she fell within the exempt classifications of a foreign vessel, or a lifeboat. 46 U.S.C. § 1453(c)(1) and (4). With this introduction we approach the issues raised in defendants' motions to suppress.

*Standing*

Although the court first dealt with questions of standing of particular defendants with respect to particular matters, we will leave this until later, and merely list at the outset certain items as to which no one had a sufficient personal interest to object. *See generally Rakas v. Illinois*, 1978, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387, *United States v. Salvucci*, 1980, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619. The court could properly find that defendants abandoned the Zodiac, the canvas bag found near the spot where the Zodiac had landed, and the box of radio equipment found in the adjacent waters. *Cf. United States v. Mustone*, 1 Cir., 1972, 469 F.2d 970, 972. While the court assumed standing as to some defendants with respect to the floating canisters containing hashish discovered subsequent to all of the arrests, we see no basis for that assumption, it being apparent that the canisters, if coming from the Tusker, were jettisoned upon the lawful approach of the

Coast Guard, as distinguished from being put overboard as a convenience in connection with off-loading. But even if some defendants could claim a possessory interest, that would no longer entitle them to standing in the absence of a legitimate expectation of privacy. *United States v. Salvucci*, ante.

### The December 12 boarding of the Tusker

■ The court found the initial boarding of the Tusker a legitimate border search. The correctness of this does not require discussion, as plainly the Coast Guard could reasonably conclude she had come from international waters. 19 U.S.C. § 1581(a); *Almeida-Sanchez v. United States*, 1973, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596; *United States v. Zurosky*, 1 Cir., 1979, 614 F.2d 779, 787–88, *cert. denied*, 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826. *See generally* Note, *High on the Seas: Drug Smuggling, The Fourth Amendment, and Warrantless Searches at Sea*, 93 Harv.L.Rev. 725, 731–38 (1980). Since probable cause existed, we need not pursue the correctness of the Fifth Circuit's analysis of *United States v. Ramsey*, 1977, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617, in *United States v. Williams*, 5 Cir., 1980, 617 F.2d 1063 (en banc).

### The arrest of Weber and Strimpel

■ By following footprints through the snow from where the Zodiac had landed, MacKeen and Fetterman came upon Weber and Strimpel lying in the woods in sleeping bags. They arrested them for a boating violation, viz., running without lights. Defendants contend this was excessive response to a misdemeanor, and merely a pretext. We need not pursue this matter; the officers had objective grounds for treating these defendants differently from the average offender of the boating laws.

*United States v. McCambridge*, 1 Cir., 1977, 551 F.2d 865, 870. Their connection with the Tusker and her probable intent was manifest, and because they had left and were seeking to escape, it was proper to take them into custody. *United States v. Miller*, 1 Cir., 1978, 589 F.2d 1117, 1128, *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771.

### The December 13, 6:00 A.M. entry on the Tusker

■ No contraband had been found on the Tusker on December 12. However, as previously stated, at the time of the Coast Guard's approaching, parties on shore had heard a series of splashes which could well have been hasty disposition of objects. At 6:00 the next morning, while she was tied up to the Naval pier, Cunniff and several others boarded the vessel and arrested Samsel, Mark Tice, and Lewis. Defendants complain that, procedurally, the agents did not sufficiently knock, or identify themselves before being invited in. On the facts found by the court, ante,[6] to which we add the fact that this was quite evidently a Naval pier not open to the public, the court was warranted in finding no violation and sufficient consent. *United States v. Miller*, ante; *United States v. Bradley*, 1 Cir., 1972, 455 F.2d 1181, 1185, *aff'd*, 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528; *Robbins v. MacKenzie*, 1 Cir., 1966, 364 F.2d 45, *cert. denied*, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140.

### The December 13 6:00 A.M. search of the Tusker

■ The entry resulting in the arrest of the defendants was justified, but the government has shown only consent to enter. Consent to enter is not consent to search, particularly not to search the entire

---

**6.** And, in addition, the court said, "After boarding the Tusker, Cunniff opened the hatch to the entryway leading to the main cabin, put his head inside, and inquired, 'Anyone there?'. Samsel who appeared to be awake, answered and invited Cunniff and his party in. As the government points out, there is no doorbell on a ship's hatch and Cunniff might reasonably assume that knocking on a steel bulkhead would be a fruitless act. Opening the hatch, without entry, and calling into the cabin was a reasonable method of attracting the attention of those inside in order to give them notice. No violation of Section 3109, even if applicable, has been shown."

vessel, notably that portion far removed from where defendants were, where the chart, Exhibit 8, was found. Consent to enter the mess area did not signify consent to search the wheelhouse. *Cf. Walter v. United States*, 1980, 447 U.S. 649, 656–57, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (dicta) (consent to search a garage does not imply consent to search an adjoining house), *Commonwealth v. Shaw*, 1978, 476 Pa. 543, 383 A.2d 496 (consent merely to enter does not authorize going to second floor). The government's burden of showing so broad a consent was not met. *Cf. Robbins v. MacKenzie*, ante.

Without consent, the warrantless search and seizure was unlawful unless it was justified by a specific exception to the warrant requirement. *E. g., Coolidge v. New Hampshire*, 1971, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–2032, 29 L.Ed.2d 564; *United States v. Miller*, ante. Whether the exceptions are still "jealously drawn," *Jones v. United States*, 1958, 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514, may be debated, but they have not swallowed the rule, and we find none applicable here. The search was not incident to the arrests, as the wheelhouse was by no means within the control or reachable area of the defendants, *Chimel v. California*, 1969, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, and a vessel on which persons are living, tied up at a Naval pier, and effectively guarded, is not comparable to an automobile on the highway. *Cf. Chambers v. Maroney*, 1970, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419. It does not appear that the chart was truly in plain view, *Coolidge v. New Hampshire*, ante, 403 U.S. at 467–68, 91 S.Ct. at 2038–39, but in any event the officers were not legitimately in the wheelhouse, where they went, independently, after defendants had collected their belongings from the crew's quarters. Taking charts was manifestly a search for evidence, and not to be justified as the inventory search permitted in connection with seizure of the vessel under 21 U.S.C. § 881. *United States v. Pappas*, 1 Cir., 1979, 613 F.2d 324, 331. Nor was the chart subject to destruction, *Chimel v. California*, ante, as the ship was being vacated, and would be watched.

The government having stipulated that Samsel, Mark Tice, and Lewis have "standing" to object to the search, we will address the issue no further, but hold that the rights of all three crew members were violated, although we might have reached a different conclusion as to Mark Tice, who denied any connection with navigation, and Lewis, who also may have had none. Of course the warrantless search did not violate the rights of the three defendants who were at no time crew members, nor those of Michael Tice and Jackson, who had left the ship and had no legitimate privacy interest in the area searched.

*The arrest of Jackson and Michael Tice*

■ Having learned, from the Tusker's crew list, of Jackson and Michael Tice, government agents arrested them in a blue pickup (in turn, learned of from the canvas bag). To the extent that this knowledge, plainly sufficient to constitute probable cause, may have come from violating the rights of persons aboard the Tusker, it did not violate theirs, and they have no standing to complain. *United States ex rel. Wright v. Cuyler*, 3 Cir., 1977, 563 F.2d 627, 632; *United States ex rel. Cardaio v. Casscles*, 2 Cir., 1971, 446 F.2d 632; *see Alderman v. United States*, 1965, 394 U.S. 165, 171–76, 89 S.Ct. 961, 965–68, 22 L.Ed.2d 176.

*The arrest, etc. of McDougal*

Although the court made extensive findings about McDougal, who was driving the blue pickup when the agents stopped it to arrest Jackson and Michael Tice, the only complaints made on his behalf in defendants' original brief, outside of the general and utterly frivolous one that there was no right to take any action with respect to any defendant until the discovery of the canisters, were two: that he was arrested without probable cause, and that his camera case was excessively searched.

■ Taking the latter first, the search of McDougal's camera case to inventory its contents was consented to. The agent was not required to close his eyes to a good faith

discovery of something behind the lining. *Frazier v. Cupp* (1969) 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684. *Cf. United States v. Jeffers,* 7 Cir., 1975, 524 F.2d 253, 255–56. We again refuse to hold "that expressions of consent relieve the officer of the need of obtaining a warrant only when the speaker is not aware that the search will disclose damaging evidence." *Leavitt v. Howard,* 1 Cir., 1972, 462 F.2d 992, 998, *cert. denied,* 409 U.S. 884, 93 S.Ct. 175, 34 L.Ed.2d 140.

■■■ As to the arrest, it is black letter law that an improper arrest does not vitiate a conviction. *See, e. g., Menard v. Mitchell,* D.C.Cir., 1970, 430 F.2d 486, 491 n.26. Further, the court's finding of probable cause was justified. In addition to his being with Jackson and Tice, the officers had the canvas bag reference to "blue p/u" and "Mac," both of which could well point to McDougal. In the truck were eight tires, four oversize, which the officers testified to being suspicious. The total would seem sufficient quite apart from McDougal's statement of having picked up Jackson and Tice as hitchhikers, which the officers had good cause to believe false.

■■■ In defendants' reply brief it was sought to argue that McDougal's pre-arrest statements should have been suppressed because he was not given *Miranda* warnings. This was too late, except for clear error. F.R.Cr.P. 52(b). We do not, however, regard it as even error. To ask a driver's connection with his passengers was not merely "routine," but understandable and straightforward. *See United States v. Pratt,* 1 Cir., 1981, 645 F.2d 89, 90–91. No *Miranda* warnings were called for.

### The search of Jackson's rainslicker

■■■ An hour after the arrest of the three occupants, the officers removed the contents of the rented blue pickup before returning it to its owner. These included, from the back, Jackson's rolled-up rainslicker. This they unrolled, finding a walkie-talkie. Unlike the unlawful early morning search of the Tusker even while a warrant to search it lawfully was being sought, with no cause for urgency, and the mishandling that exposed the patrol boat, permitting the jettisoning of the canisters, this action was understandable. Before the Court's all-embracing definition of containers and its rejection in the plurality opinion in *Robbins v. California,* (1981) 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744, of our view of the importance of inquiring into expectations of privacy, *e. g., United States v. Goshorn,* 1 Cir., 1980, 628 F.2d 697, the officers might reasonably have thought their unrolling the slicker permissible without a warrant. Now, however, we feel obliged to hold it was not.

In *Robbins* the plurality opinion,[7] (all quotations are from 453 U.S. 426, 101 S.Ct. 2846) criticized various lower court cases "that have drawn a distinction between pieces of sturdy luggage, like suitcases, and flimsier containers, like cardboard boxes." It went on to say, "What one person may put into a suitcase, another may put into a paper bag." The test of "container" was simply whether it was "closed [and] opaque."[8]

This definition, particularly the opaqueness, met the expectation-of-privacy re-

7. Except for restrictions advanced in Justice Powell's concurrence-in-the-judgment opinion, the other justices mainly appeared to wish to extend the "automobile exception," rather than to disagree with general definitions of containers.

8. In *New York v. Belton,* (1981) 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768, the Court stated in footnote 4,

"'Container' here denotes any object capable of holding another object. It thus includes closed or open glove compartments, consoles, or other receptacles located any-

where within the passenger compartment, as well as luggage, boxes, bags, clothing, and the like. Our holding encompasses only the interior of the passenger compartment of an automobile and does not encompass the trunk."

Unlike our dissenting brother, we read this not as a special enlargement of the general meaning of container, but as an emphasis that closed as well as open ones may be inspected without a warrant in a very specific area of an automobile.

quirement. If one could see through, or, alternatively, know the contents from a tell-tale shape, there could be no such expectation; otherwise, the objective test was met by the fact that the container was "closed."

There was no suggestion that the officers could tell what was inside the rainslicker before unrolling, and the presumption would be to the contrary in the absence of such. Equally, there was no suggestion that the discovery was inadvertent. Contrary to our dissenting brother's posit, we do not envisage as a proscribed container a mere fold that could be expected to lead to a revelation in the normal course of handling. If "normal course of handling" does not create a totally bright line, it seems clearly sharper than a general rule where the police, and ultimately the court, will reach factual conclusions as to the owner's intent. It is true that in *Robbins* the plastic bags were fastened, and the slicker was not. However, we think it would be making fine, and harmful, distinctions to inquire into the subjective purpose of the extent of the closure. Arguably, a string around a rolled-up slicker could be intended to increase the physical protection, not the privacy. The *Robbins* "bright line" definition and purpose, however, would be blurred by introducing such questions of subjective intent. We hold that if what is within, or enclosed, in another object cannot be objectively known, or at least reasonably believed to be known, by external inspection, without opening or undoing that object, a warrant is needed to discover it, in the true sense of the word, unless the case falls within some recognized exception. There was none here. A warrant should have been sought, and the walkie-talkie was not admissible against Jackson.

*The effect of the illegal seizures.*

■ Had there been a normal trial, the defendants' central defense would have been that the Tusker's presence at Little Machias Bay was inadvertent, due to electrical, etc. failure. As already indicated, the evidence seems overwhelmingly to the contrary. However, perhaps the most individually damning evidence was Exhibit 8, the copy of chart 1201 found in the wheelhouse. On it the mouth of Little Machias Bay was designated with a red spot, with a course leading to it. Had this appeal followed a trial in the ordinary manner and had this chart been improperly admitted, the other evidence was so strong that even such a clincher might possibly have been found merely cumulative and nonprejudicial within the rule of *Chapman v. California*, 1967, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705. Rather clearly this would seem so as to Jackson's walkie-talkie. However, this is not what occurred. Defendants' stipulations and waivers were made on the assumption and condition not merely that their right of appeal was preserved,[9] but that the evidence was properly admissible against them. In fairness, this should mean all the evidence. The Seventh Circuit and two important state courts, in well-considered opinions, have held that a court has no right to decide for a defendant that his decision (in those instances, to plead guilty) would have been the same had the evidence the court considers harmless not been present. *Jones v. Wisconsin*, 7 Cir., 1977, 562 F.2d 440, 445–46; *People v. Grant*, 1978, 45 N.Y.2d 366, 378–80, 380 N.E.2d 257, 408 N.Y.S.2d 429; *People v. Hill*, 1974, 12 Cal.3d 731, 117 Cal.Rptr. 393, 528 P.2d 1, 29–30. *See also State v. Monahan*, 1977, 76 Wis.2d 387, 251 N.W.2d 421,

9. The propriety of this general procedure, functionally equivalent to a conditional guilty plea, has never received our express approval. *See United States v. Warwar*, 1 Cir., 1973, 478 F.2d 1183, 1185 n.1. Other circuits are in conflict, *see United States v. DePoli*, 2 Cir., 1980, 628 · F.2d 779, 781 n.1; Note, *Conditional Guilty Pleas*, 93 Harv.L.Rev. 564 (1980), although much of the controversy revolves over allowing

conditional pleas, not here involved. *Compare United States v. Mendoza*, 5 Cir., 1974, 491 F.2d 534, *with United States v. Sepe*, 5 Cir., 1973, 486 F.2d 1044. While the present procedure may result in piecemeal proceedings, see post, the normal saving in judicial time seems worth it, on the assumption that the district court has given the matter more than pro forma approval. See Note, ante, at 572–76.

426 (decided without discussion).[10] We agree. It follows that Jackson is entitled to vacate his stipulation and have a new trial without evidence of the walkie-talkie, and Samsel, Mark Tice and Lewis, a new trial without use of the chart. If they elect to do so, the government's stipulations, by their terms, will be equally vacated. The court's actions on the motions to suppress are otherwise affirmed, and the convictions of Weber, Strimpel, McDougal and Michael Tice are affirmed, as their rights were not invaded. *Rakas v. Illinois,* ante.

COFFIN, Chief Judge (dissenting in part).

While agreeing with all other parts of the court's opinion, I deem it both unnecessary and inappropriate on this record to conclude that the Fourth Amendment required exclusion of the walkie-talkie found in Jackson's rolled up rainslicker. I would instead affirm the district court's ruling that defendant Jackson had not manifested a reasonable expectation of privacy in the rainslicker.

The standards announced by the Supreme Court in *Robbins v. California,* 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), govern this case. The Court held that a warrantless search of a carefully wrapped and sealed package violated the Fourth Amendment. Four Justices argued that any "closed, opaque container" merits Fourth Amendment protection. *Id.* at 426, 101 S.Ct. at 2846 (opinion of Stewart, J., joined by Brennan, Marshall & White, JJ). It was this combination of characteristics that "manifested an expectation that the contents would remain free from public examination." *Id.* at 426, 101 S.Ct. at 2846 (*quoting United States v. Chadwick,* 433 U.S. 1, 11, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 (1977)). Justice Powell concurred in the judgment "because the manner in which the package at issue was carefully wrapped and sealed evidenced petitioner's expectation of privacy in its contents." *Id.* 453 U.S. at 429, 101 S.Ct. at

2847 (Powell, J., concurring in the judgment).

I construe *Robbins* to mandate two distinct lines of Fourth Amendment analysis. First, if an object is a "closed, opaque container" it may not be searched without a warrant, absent an exception to the warrant requirement. Second, even if an object does not qualify as a "closed, opaque container", a warrant will be required to search it if someone has manifested a reasonable expectation of privacy in the object. This dual test has the advantage of creating a bright line to guide police officers while preserving the Fourth Amendment's traditional emphasis on protecting an individual's expectation of privacy.

This court's ruling today, in my view, misconstrues the holding in *Robbins.* While the court agrees that an object must be "closed [and] opaque" to satisfy the plurality's formulation, it adopts an overly broad definition of "container". The court interprets *Robbins* to mean that "[t]he test of 'container' was simply whether it was 'closed [and] opaque' ". Thus whenever something is "within or enclosed in" an object that must be "open[ed]" or undo[ne]" to reveal the identity of its contents, that object is a container for Fourth Amendment purposes. The court therefore holds that since the rainslicker had to be unrolled to reveal the walkie-talkie, a warrant was required to conduct the search.

The court's holding relies on the Supreme Court's "all-embracing definition of containers" in *New York v. Belton,* 453 U.S. 454, 460 n. 4, 101 S.Ct. 2860, 2864 n. 4 (1981), as "any object capable of holding another object." But in my view it is inappropriate to extend this definition beyond the subject matter of that case. The Court in *Belton* was dealing with a search contemporaneous with a lawful custodial arrest of an occupant of an automobile and held that such a broad definition was justified since any article, including a container, is within reach of the arrestee and falls under the

---

**10.** A further court has rejected the conditional plea procedure partly for the reason that it can lead to reversal because of harmless error.

*United States v. Cox,* 6 Cir., 1972, 464 F.2d 937, 945.

rule of *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). *Belton, supra,* 453 U.S. at 458, 101 S.Ct. at 2863. This rationale clearly does not apply to the facts of the case before us. Moreover, I attribute some limiting significance to the use of the word "here" in *Belton's* definitional footnote: " 'Container', *here* denotes any object capable of holding another object." *Id.* at 460 n. 4, 101 S.Ct. at 2864 n. 4 (emphasis added). I see similar significance in the sentence closing that footnote: "Our holding encompasses only the interior of the passenger compartment of an automobile and does not encompass the trunk." *Id.* One can read this sentence not merely to emphasize that warrantless searches contemporaneous with a lawful custodial arrest are only permissible in the passenger compartment—a thought communicated elsewhere several times—but also to suggest that the definition of "container" is limited to this context as well.

*Robbins,* on the other hand, resembles the case at bar in that it did not involve a search contemporaneous with arrest, and thus seems the more relevant precedent. I am impressed by the fact that every one of the many references to "container" in all the opinions in *Robbins* describes objects fabricated and particularly suitable for the sole purpose of containing other things. Justice Powell, in his concurring opinion, seems to corroborate this understanding when he writes: "In accordance with the plurality's usage I use the term 'container' to include any and all packages, bags, boxes, tins, bottles and the like." *Robbins, supra,* 453 U.S. at 429 n. 1, 101 S.Ct. at 2847 n. 1 (Powell, J., concurring in the judgment).

I view *Belton* as designed to give law enforcement officers an open sesame to search all objects within an automobile's passenger compartment in connection with a contemporaneous arrest—including anything that could hold anything else. *Robbins,* in contrast, restricts officers in other kinds of searches. To incorporate the same all-embracing definition of "container" in a *Robbins* context dramatically increases the restrictiveness of the holding. It seems to me that had the Justices intended *Belton* to define "container" for all Fourth Amendment purposes, *Robbins,* decided the same day, would have reflected this fact.

I would therefore not expand *Robbins'* definition of container in a non-arrest setting to encompass rainslickers, blankets, newspapers or other objects which may be used to hold other things. Such an overly broad definition would impede law enforcement officers in too many cases where no reasonable expectation of privacy exists. This court's statement of its holding, for example, implies that the officers could have legally seized the walkie-talkie if they had discovered it lying underneath the rainslicker but not if the walkie-talkie lay within a fold of the slicker. This result is, in my view, not supported by the Fourth Amendment's concern with expectations of privacy or by the effort to create bright line distinctions for law enforcement officers.*

I agree with the district court that defendant Jackson did not have a reasonable expectation of privacy when he left the walkie-talkie wrapped up in the rainslicker in plain view in the back of a truck. A rainslicker, unlike a piece of luggage or other container, 'offer[s] at best only minimal protection against accidental and deliberate intrusions.' *United States v. Goshorn,* 628 F.2d 697, 700 (1st Cir. 1980). Jackson could not reasonably expect that an object rolled within the rainslicker would remain unrevealed once the law enforcement officers legitimately took possession of the rainslicker. I would therefore affirm the district court's ruling on this issue.

---

* The court has responded to this hypothetical by stating that "we do not envisage as a proscribed container a mere fold that could be expected to lead to a revelation *in the normal course of handling.*" (Emphasis added.) This formulation, though a narrowing one, appears to undermine the court's effort to create a bright line test. While I agree that how an object responds when handled is relevant in determining whether a person has a reasonable expectation of privacy in its contents, I am unwilling to adopt the court's formulation as a per se rule.

ON PETITIONS FOR REHEARING

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

ALDRICH, Senior Circuit Judge.

Petitions for rehearing have been filed by all defendants and by the government with respect to those who were granted a new trial. Defendants' petition continues what, in their brief, we found objectionable, and is affirmatively unmeritorious. It is denied, as is the motion to strike that portion of the opinion entitled "The Fantasies."

The government's petition falls into two parts: for defendants Samsel, Mark Tice and Lewis, who complained of the warrantless seizure of a chart which, by markings thereon, conclusively refuted their claim that the vessel's presence in the bay was accidental, and for defendant Jackson, whose unrolled rainslicker exposed a walkie-talkie. We consider them separately.

*The Chart.*

▉ The government states, "... the [6–8] charts were found lying exposed in the wheelhouse ... in plain view." We do not, on the evidence, agree with that characterization. The charts may have been in plain view as charts, but not their significance. The sole testimony, that of Agent Cunniff, was,

> "I saw some charts lying on a table which I call a chart table near where the wheel of the tug was, and I collected all of these charts, seized them."

Thus it did not appear whether the charts were folded or unfolded, or even that the chart in question was on the top of what, in light of their size, was necessarily a pile. If the government has the burden of showing that "plain view" means that the significant portion of the chart in question was open and exposed, it has failed to show it.

▉ While there have been many opinions as to what is in plain view,[1] where, as here, the government's burden is to show that a discovery was inadvertent, discovery of content by rummaging among a pile of papers is not inadvertent unless the rummaging itself was initially justified. *E.g., United States v. Scios,* D.C. Cir., 1978, 590 F.2d 956, 963 n.15 (en banc); *United States v. Ochs,* n.1, ante ("an otherwise valid search"). Here it is apparent that the charts were seized wholesale, not as a result of inadvertent observation of "plain view" tell-tale marking on one of them. *See Walter v. United States,* 1980, 447 U.S. 649, 653–54, 100 S.Ct. 2395, 2399–2400, 65 L.Ed.2d 410.

For this there was no basis. The difficulty of justifying a warrantless seizure of a chart is well illustrated by the extensive path we followed in *United States v. Miller,* 1 Cir., 1978, 589 F.2d 1117, 1125–26, *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771. None of the possible justifications there indicated and found was duplicated here. The government's present claim, that the charts were taken (or, we would add, even examined) as part of Agent Cunniff's duty "to inventory and safeguard [the vessel's] contents" is purely imaginative. There was no inventorying, and the entire vessel was crewless and under guard. It seems equally cavalier to say the "charts were subject to forfeiture." This assumes the whole point. The vessel was searched for drugs the night before. The government does not show the charts were not taken for evidence by protesting that the agent did not pull out drawers and search for other evidence elsewhere.

▉ Nor are we persuaded by the government's argument that we overlooked that the charts were "subject to administrative inspection," and misconstrued the effect of government counsel's trial concession of defendants' standing, because "appellate Government counsel neglected to point out the obvious." If anything is obvious, it is that this was not an administrative (document) inspection. Nor do we know of any rule that, whatever may be subject to administrative inspection (assuming, which

1. *See United States v. Ochs,* 2 Cir., 1979, 595 F.2d 1247, 1257 n.8 (listing cases), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328.

we doubt, that charts are) loses all fourth amendment protection and may be seized without a warrant, at any time, for any purpose. That would be to swallow the camel with the gnat. Matthew 23:24.

As to standing; we pointed out in our opinion, at p. 850, that on the evidentiary record we would have had serious doubts as to the right of Mark Tice and Lewis to object to the search of the wheelhouse, but in light of the government's stipulation[2] they stood—we use the word advisedly— with Samsel. If the stipulation was ill advised, this is not the time to correct it even if, as the government now suggests by citing our opinion in *United Stated v. Arra,* 1 Cir., 1980, 630 F.2d 836, 841 n.6, two of the defendants might well have had a problem. In this, and as to Samsel alone, the government's attempt to limit the scope of standing vis-a-vis the disputed articles can only recall the mother who gave her daughter permission to go out to swim so long as she kept away from the water.

*The Rainslicker*

The uncertainties in the law in this area, leading to the initial division of the panel, have been expounded at far greater length in the several opinions in *United States v. Ross,* D.C. Cir., 1981, 655 F.2d 1159. In light of the Court's granting certiorari in that case, and making special inquiry as to the continued vitality of *Robbins v. California* (1981) 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744, *see* 50 U.S.L.W. 3265 (10/13/81), it may be expected that whatever we now decide will have but short precedential value. In the meantime, while the majority of the panel has not changed its views based thereon, all are now persuaded by the government's claim that *Robbins'* enlarged concept of containers is not retrodictated. *Cf. United States v. Peltier,* 1975, 422 U.S. 531, 535–39, 95 S.Ct. 2313, 2316–18, 45 L.Ed.2d 374.

The evidence with respect to the rainslicker was brief. In the back of the pickup there were a number of tires. The slicker was seen "folded up, laying on top of those tires." When the pickup was surrendered to the rental agency the slicker was taken to the Marshal's office, where "it was unrolled and the radio was discovered inside it." Although, by bulk and weight, the walkie-talkie may well have made its presence, but not its identity, known before unrolling, it might be natural not to think of the slicker, particularly where so exposed, as a container protected under the prior cases, and we cannot say the court was unwarranted in declining to suppress.

Our prior ruling as to Jackson is rescinded, and his conviction is affirmed. With this exception, both petitions for rehearing are denied.

---

**2.** These three defendants having objected in the district court to "items seized from the Vessel," government counsel stated, "... whatever search was conducted by Mr. Cunniff on the 13th ... I will concede standing on those three days for these three defendants."