Cheshire
No. 81-007
No. 81-009

THE STATE OF NEW HAMPSHIRE

v.

JOHN A. SETTLE, JR.

THE STATE OF NEW HAMPSHIRE

v.

THOMAS E. DURLING

March 10, 1982

*Gregory H. Smith*, attorney general (*Brian T. Tucker*, assistant attorney general, on the brief and orally), for the State.

*James E. Duggan*, appellate defender, on the brief and orally, for the defendant Settle.

*Cristiano, Kromphold & Green*, of Keene (*Peter W. Heed* on the brief and orally), for the defendant Durling.

BATCHELDER, J. (with whom KING, C.J., concurs). The defendants were convicted by a jury in Cheshire County Superior Court of receiving stolen property and conspiracy to receive stolen property. The property in question consisted of a collection of firearms, exceeding two hundred and fifty in number, which had been removed during the course of a burglary from "Trader John's," a mercantile establishment in Winchester, New Hampshire, on the night of January 17, 1980. Several issues were raised in this appeal, but, by agreement of the parties and approval of this court, only one issue was briefed and argued before this court; the other issues have been reserved pending the disposition of this issue.

The question raised in this appeal is whether the defendants have standing to challenge the legality of a warrantless search of the premises of a third party, James M. Scranton, conducted by the police on March 24, 1980. We hold that the New Hampshire Constitution requires that they be given standing.

The facts which gave rise to the search and ultimate constitutional questions were developed for the record during a suppression hearing conducted by the Trial Court (*Contas*, J.), commencing November 3, 1980. The trial court ruled that the initial entry by the police constituted an illegal search. Having determined that

the search was illegal, the trial court then ruled that, under the United States Constitution, the defendants in this case did not have standing to contest the search and refused, therefore, to suppress the evidence obtained.

At the time of the suppression hearing, James M. Scranton, age 24, resided with his parents in Keene, New Hampshire, and was engaged from time to time in cutting cordwood on a two-hundred-acre lot owned by his father, William Scranton. James Scranton had carried on the woodcutting operation on the woodlot for a period of time prior to the events of this case. At some point prior to 1980 James Scranton, with the help of friends, had constructed a one-room cabin on the father's woodlot. The cabin, of modest dimensions and construction, might be categorized as a make-shift hunting or fishing camp. In addition to the four walls and roof, the cabin contained a stove, windows, and a door. The door swung open to the outside onto a porch or landing and had no fastener or latch. The door did not open inward. The windows of the cabin were completely covered so that no one could see inside. Adjacent to the cabin was an outdoor toilet facility or outhouse. The cabin was at least three hundred feet from an old dirt road and could not be seen from the road.

Some time during the third week in March 1980, James Scranton was introduced to the defendant Settle, who at the time styled himself as one John Smith. Settle, explaining to James Scranton that he possessed a substantial gun collection that he believed he might lose as a result of legal action in a pending divorce proceeding, arranged with Scranton to store the guns in the Scranton camp for an indeterminate period of time during which Settle proposed to clean and crate the gun collection. In exchange for the use of the Scranton camp for this purpose, Scranton was to be given his choice of a rifle or shotgun plus a handgun. Within a few days of the conversation, the guns were placed in the camp by Settle, John and Mark Durling, and Scranton. The windows were covered from the inside, and the door was closed by placing a chain saw, weighing between thirty and forty pounds, against it to prevent the door from swinging out. On the door of the cabin was a sign reading "KEEP OUT." Scranton and Mark Durling, at the request of Settle, stayed at the cabin one night to guard the guns.

The police in the Keene area received information, the basis and nature of which are not material to this case, that the stolen guns might be located on property that later turned out to be owned by William Scranton. On March 24, 1980, a member of the New Hampshire State Police, together with various local and county police officers, arrived at the Scranton camp, where the law

enforcement personnel made an unlawful entry into the building and immediately learned of the presence of the collection of firearms. Possessing this information, the law enforcement personnel closed the door to the cabin and then proceeded to obtain a search warrant.

We are asked in this case to determine whether the automatic standing rule adopted by this court in *State v. Crump*, 107 N.H. 62, 65, 217 A.2d 183, 186 (1966), and more recently affirmed in *State v. Ruelke*, 116 N.H. 692, 693, 366 A.2d 497, 498 (1976), constitutes the standard by which searches must be judged or whether the "legitimate expectation of privacy" doctrine, expressed more recently by the United States Supreme Court in *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) and *United States v. Salvucci*, 448 U.S. 83, 91–92 (1980), governs.

 This court has historically viewed the rights of people in light of both the United States Constitution and the Constitution of the State of New Hampshire. *State v. Beede*, 119 N.H. 620, 625, 406 A.2d 125, 129 (1979), *cert. denied*, 445 U.S. 967 (1980); *State v. Theodosopoulos*, 119 N.H. 573, 578, 409 A.2d 1134, 1137 (1979), *cert. denied*, 446 U.S. 983 (1980). Our constitution often will afford greater protection against the action of the State than does the Federal constitution. In *State v. Osborne*, 119 N.H. 427, 402 A.2d 493 (1979), we stated that "this court [can] impose a heavier burden on the State under the New Hampshire Constitution. . . ." *Id.* at 433, 402 A.2d at 497. Previously, we have held that the protection against double jeopardy, found in N.H. CONST. pt. 1, art. 16, is greater than that provided by the Federal constitution, *compare State v. Hogg*, 118 N.H. 262, 263–67, 385 A.2d 844, 845–47 (1978) *with Bartkus v. Illinois*, 359 U.S. 121, 136 (1959), and that, contrary to the federal practice, the reasonable doubt standard must be used by the trial judge when ruling on the voluntariness of a defendant's confession. *Compare State v. Phinney*, 117 N.H. 145, 146, 370 A.2d 1153, 1154 (1977) *with Lego v. Twomey*, 404 U.S. 477, 486–87 (1972).

The language of the New Hampshire Constitution is clear:

"[Searches and Seizures Regulated]. Every subject hath a right to be secure from *all* unreasonable searches and seizures of his person, his houses, his papers, and *all his possessions*. Therefore, *all warrants* to search suspected places . . . *are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation . . . and with the formalities, prescribed by law*."

N.H. CONST. pt. 1, art. 19. (Emphasis added.) We are convinced that the language of our constitution requires that "automatic standing" be afforded to all persons within the State of New Hampshire who are charged with crimes in which possession of any article or thing is an element. Article 19 prohibits *all* unreasonable searches of *all* a citizen's possessions. Absent a recognized exception to the warrant requirement, a warrantless search is *"per se* unreasonable." *State v. Beede*, 119 N.H. at 625, 406 A.2d at 129; *State v. Theodosopoulos*, 119 N.H. at 578, 409 A.2d at 1137.

We are not the only court to conclude that its State constitution requires a greater degree of protection of individual rights than does the Federal constitution. *See* cases cited in Y. KAMISAR, W. LAFAVE & J. ISRAEL, MODERN CRIMINAL PROCEDURE at 2-5 (4th ed. Supp. 1980). The California Supreme Court has noted that the cases decided by the United States Supreme Court represent the application of only "the *minimum* standards required in order to satisfy the Fourth Amendment's proscription against unreasonable searches." *People v. Brisendine*, 13 Cal. 3d 528, 545, 531 P.2d 1099, 1110, 119 Cal. Rptr. 315, 326 (1975). (Emphasis in original.) Nor are we the first State to hold that the protection against unreasonable searches and seizures of its State constituiton is greater than that provided by the fourth amendment. The Supreme Court of Louisiana and the Supreme Court of New Jersey have also recognized that their constitutions require that automatic standing be given to any person adversely affected by an unreasonable search or seizure. *State v. Gibson*, 391 So. 2d 421, 425 (La. 1980); *State v. Culotta*, 343 So. 2d 977, 981–82 (La. 1976); *State v. Alston*, 88 N.J. 211, 225–30, 440 A.2d 1311, 1318–21 (1981).

■ Furthermore, we believe that the automatic standing rule required by the New Hampshire Constitution offers several benefits to the sound administration of criminal justice. The federal "automatic standing" rule originated in *Jones v. United States*, 362 U.S. 257, 264–65 (1960), where the Court determined that, in order to show a possessory or proprietary interest sufficient to assert fourth amendment rights, the defendant, in effect, would otherwise be required to admit guilt where (as in this case) the possession (receiving stolen property, RSA 637:7) was, itself, a crime. *See id.* at 261–62. Soon thereafter, this court adopted the "automatic standing" rule in *State v. Crump*, 107 N.H. 62, 65, 217 A.2d 183, 186 (1966). The United States Supreme Court totally abandoned the *Jones* automatic standing rule in *United States v. Salvucci*, 448 U.S. at 85. The court reasoned that the basis for requiring automatic standing no longer existed because *Simmons v. United*

*States*, 390 U.S. 377, 394 (1968), held that testimony put forth in support of a motion to suppress could not be used against the defendant at trial on the issue of guilt. *United States v. Salvucci*, 448 U.S. at 89–90. *But see id.* at 93–94 nn.8 & 9 (leaving open the question whether suppression hearing testimony could be used to impeach the defendant at trial). Additionally, a strong argument in support of automatic standing may be made on the very simple and practical premise that—for the benefit of law enforcement, the trial courts, and the trial bar—that class of persons who may assert rights against unlawful searches and seizures should be clearly defined.

■■ The "legitimate expectation of privacy" doctrine is no boon to the general administration of the criminal justice system, the law enforcement establishment, the workload of the trial courts, or clearly defined constitutional rights. It introduces into the law enforcement and judicial process yet another flexible threshold determination to be made for the orderly and fair disposition of criminal cases. The courts will be asked first to determine "standing" based upon reasonable expectation of privacy before reaching the hearing stage dealing with probable cause, exigent circumstances or impartiality of the magistrate, to name but a few areas of question at a suppression hearing.

Our review of the cases decided under the "legitimate expectation of privacy" doctrine shows us that its administration is not without problems. Appellate courts have been forced to draw fine distinctions whose logical bases are questionable. A recent First Circuit case wrestled with the fact that the legitimate expectation of privacy analysis might lead to differentiating among an object tied up in a rain slicker, one that is wrapped in a slicker, and one merely lying under the slicker. *United States v. Weber*, 668 F.2d 552, 561–62 (1st Cir. 1981); *id.* at 564 (Coffin, C.J., dissenting in part). Other courts have held that there is no privacy interest in material stored in a condominium garage, *United States v. Cruz Pagan*, 537 F.2d 554, 557–58 (1st Cir. 1976), but there could be in a rural house being observed from a honeysuckle patch that is 150 feet away from the house, *United States v. Van Dyke*, 643 F.2d 992, 994–95 (4th Cir. 1981); there is also a privacy interest in a shed near a rural farm house, *United States v. Holmes*, 521 F.2d 859, 869–70 (5th Cir. 1975), but not in the trunk of a junked car in the defendant's farm field, *United States v. Ramapuram*, 632 F.2d 1149, 1155–56 (4th Cir. 1980), *cert. denied*, 101 S. Ct. 1739 (1981).

Such distinctions can be drawn, after several months' reflection, by an appellate court, but we think that they fail to give any useful

guidance to those whom we require to follow their complexities: the policemen on the street. One justice on this court has previously stated that he believes most lawyers and academics could not articulate or apply fourth amendment rules, if asked to do so, in a squad car at 3 A.M. C. Douglas, *State Judicial Activism—The New Role for State Bills of Rights*, 12 SUFFOLK L. REV. 1123, 1138 (1978). And when the policeman guesses wrong, the evidence that he has seized will be suppressed. The protection of constitutional rights and effective law enforcement will be better aided by a simpler, less fact-specific test.

The record reveals that the collection of guns in this case has been correctly restored to the appropriate owner. Hence, no order is required with respect to the disposition of the collection of guns.

DOUGLAS, J. I concur with my brother Batchelder only with regard to the standing *result* in this case but not the automatic standing rationale. Yet that does not end the matter for me. In this case, the trial judge would have suppressed the evidence but for the defendants' lack of standing, on the ground that the police officers' warrantless search had violated the fourth amendment. Because he held that the defendants had no standing, however, the trial judge allowed the evidence to be introduced. I would uphold the trial court's decision to admit the evidence despite his ruling on the standing issue, because the officers acted in good faith.

On Sunday afternoon, March 23, 1980, two teenagers reported to the police that they had discovered a pile of guns lying in a hole covered with plastic in the woods in Chesterfield, New Hampshire. The next day, four police officers accompanied the two teenagers to the spot. The guns were not there, but the area around the hole was matted down and there were pieces of plastic on the ground. Tracks went down a path into the woods. The teenagers then told the police that they knew of a cabin in the vicinity, hidden from the road.

The police then followed the path to the cabin. From photographs introduced into evidence, it would be generous to call the structure a cabin. It is a small, wooden shack with covered windows more akin to something teenagers might make out of odds and ends of wood. While there was some indication of occupation, a chain saw was wedged against the *outside* of the door. The police approached the shack with their guns drawn, one officer called out, and then opened the door. He reported that many guns were stored inside. Another officer, who said he was familiar with the guns stolen from Trader John's, reopened the door to see if he

could identify any of the guns. When he reported that he could, the police *then* decided to obtain a search warrant.

Two officers were left to guard the cabin while the two other officers went to get the warrant. The police used the warrant only to remove the guns. While they were doing this, the apparent owner of the cabin, James Scranton, arrived and was arrested. The two defendants before us were arrested later.

The defendants filed a motion to suppress the use of the 260 firearms as evidence against them in their trial for possessing stolen property, to wit, the guns. The trial judge held a full evidentiary hearing and found that the warrantless search had violated the fourth amendment. He would have suppressed the evidence, but because he ruled that the defendants were without standing to raise the issue, the evidence was deemed to be admissible. The State first conceded at oral argument that the search was improper but that concession is not necessarily binding on us.

I conclude that the fourth amendment was not violated because the police officers who conducted the search acted in good faith. The police in this case were justifiably concerned about the fact that two teenagers had found firearms in the woods. *See Rhode Island v. Innis*, 446 U.S. 291, 294–95 (1980) (discussion among police officers that children could be killed if they found the defendant's loaded gun). At the time the search began, the police thought the weapons were under plastic covering in the woods, not in a building, and thus likely to be in plain view. Given the dangerousness of the objects sought, the opening of the cabin door was not such an intrusion as to be a bad-faith violation of the fourth amendment. Thus, the exclusionary rule of *Mapp v. Ohio*, 367 U.S. 643, 655 (1961), does not apply. *See United States v. Williams*, 622 F.2d 830, 840–47 (5th Cir. 1980), *cert. denied*, 449 U.S. 1127 (1981) (Gee and Vance, JJ.). Prior to *Mapp v. Ohio*, Justice Cardozo observed that "the criminal is to go free because the constable has blundered." *People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585, 587, *cert. denied*, 270 U.S. 657 (1926).

Not even a judge, in the position of an officer on the beat or on patrol, could give instantaneous legal advice that would be *sure* to withstand State and federal judicial scrutiny years down the road, as the seizure issue wound its way through the appeal process. One author, discussing *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), queried "how the police of Manchester, New Hampshire, could have been expected to know that the Constitution required more of them than they had done when the members of the [United States] Supreme Court, after studying the matter for more than five months, had such great difficulty in deciding the mat-

ter." *See* Wright, *Must the Criminal Go Free if the Constable Blunders?*, 50 TEX. L. REV. 736, 745 (1972). Expecting our police to perform analyses at 3 A.M. on a street corner, which are beyond our own capabilities, is absurd, illogical, and harmful to the practical administration of justice. *See, e.g., State v. Theodosopoulos*, 119 N.H. 573, 580, 409 A.2d 1134, 1139 (1979), *cert. denied*, 446 U.S. 983 (1980) (police must act expeditiously in emergency).

Federal officers play only a miniscule role in the criminal justice scheme. If the federal judiciary wishes to enforce the exclusionary rule in order to supervise federal officers, it should be free to do so; however, it is unfair and unrealistic to impose the rule in street crime settings under our scheme of federalism.

BROCK, J. (Dissenting on the automatic standing issue, but agreeing with Batchelder, J. and the Chief Justice that the defendants' convictions must be set aside.)

I respectfully disagree with the plurality decision that the defendants Settle and Durling have "standing" to challenge the legality of the police search of the "cabin" erected by James Scranton on property owned by his parents.

Neither the fourth amendment to the federal constitution, the language of pt. 1, art. 19 of our State constitution, nor prior decisions of this court following *Jones v. United States*, 362 U.S. 257 (1960), which has since been overruled by the United States Supreme Court, compel such a result. *See Rakas v. Illinois*, 439 U.S. 128 (1978), and *United States v. Salvucci*, 448 U.S. 83 (1980).

The test which should be employed in determining whether or not a particular defendant has standing to assert violations of the search and seizure provisions of our constitution, thereby invoking for himself the benefits of the exclusionary rule, is: does the conduct which the defendant challenges involve an intrusion into his legitimate expectations of privacy with reference to the items seized and the place searched, thus violating *his* constitutional rights. *See United States v. Salvucci, supra* at 93.

The record before us and the facts found by the trial court in this matter support its determination that the defendants Settle and Durling had no standing to challenge the legality of the search of the Scranton cabin. Accordingly, I would affirm its decision to admit into evidence the items found in the cabin.

Because, however, three members of this court are of the opinion that the defendants have "standing" to contest the legality of the search and seizure in this matter and neither the legality of the search and seizure nor "good-faith" issues were properly before the court on this appeal, I reluctantly agree with my brothers Batch-

elder and the Chief Justice that defendants' convictions must be set aside.

Bois, J. I am unalterably opposed to the automatic standing rule. In addition, I have grave reservations as to the vitality of the exclusionary rule and would be in favor of abolishing it. However, being bound by the federal decisions recognizing the exclusionary rule, I join with my Brother Brock in holding that on the facts of the present case, the defendants did not have a legitimate expectation of privacy in the premises involved.

*Reversed and remanded.*