UNITED STATES of America, Plaintiff,

v.

Jorge A. FARINACCI–GARCIA,
Defendant.

Crim. No. 82–0050CC.

United States District Court,
D. Puerto Rico.

Nov. 22, 1982.

---

Sp. Prosecutor David Buvinger, Lawrence Lippe, James G. Walker U.S. Dept. of Justice, Hato Rey, P.R., for plaintiff.

Harry Anduze-Montaño, Pedro Varela, María Fernós, Hato Rey, P.R., for defendant.

## OPINION AND ORDER

CEREZO, District Judge.

The events which gave rise to the Fourth Amendment claim raised by Jorge A. Farinacci in his suppression motion occurred while special agents executing a material witness arrest conducted a warrantless search of a leather briefcase found in his car, after he had been taken into custody and while his vehicle was being driven by one of the agents.

On March 10, 1982 four FBI agents were conducting surveillance of the Isla Verde area with the purpose of locating attorney Jorge A. Farinacci against whom an arrest warrant had been issued by the U.S. Magistrate to compel his appearance as a material witness before a grand jury investigating an armed bank robbery which had occurred on August 5, 1977 in Bayamón, Puerto Rico. Three of the four agents engaged in the surveillance—Rivero, Balingieri and Sutton—participated in the arrest. All of them testified during the suppression hearing before the Magistrate that the only reason for arresting Mr. Farinacci was because there was a warrant for his arrest as a material witness before the grand jury.[1]

---

1. The following are the relevant excerpts of the agents' testimony:

*Agent Rivero:*

Q. And that warrant of arrest as a material witness was for him to appear as a witness before the grand jury?

A. That is correct....

Q. When you arrested Mr. Farinacci, did you make an investigation and arrest him because you felt he might have been trafficking in some contraband?

A. No. (July 21, 1982 hearing; TR 47–48.)

On that afternoon agents Rivero and Balingieri spotted Mr. Farinacci driving a Datsun in the opposite direction from them on the Isla Verde Road. He was not accompanied by other persons. They turned around and followed him. Mr. Farinacci increased the speed at which he was driving while the agents' car gave chase. When defendant came to an intersection he stopped to make a left turn and, at that time, agents Rivero and Balingieri got out of their car with their guns drawn. Mr. Rivero walked towards the passenger's side of defendant's car while Mr. Farinacci got out from the driver's side. Agent Balingieri reached defendant's car while he was still inside, pointed his gun at defendant, identified himself as a special agent from the FBI and told him he was under arrest. By the time Rivero reached defendant, he had already opened the door and gotten out of the car saying: "I give up. I am Farinacci. Go ahead and give me the papers." While Balingieri covered Rivero, the latter patted defendant and handcuffed him placing his hands behind him. No weapons were found on him. Mr. Farinacci did not resist detention. Upon being handcuffed, he was placed in the back seat of agent Rivero's two-door vehicle. From that moment on he was within their complete custody and control until he was turned over to the U.S. Marshal. At no time did defendant attempt to return to his vehicle after abandoning it nor did he try to force himself back to it.

By the time Mr. Farinacci was handcuffed by these two agents, a third one—agent Sutton—came over from across the road. The motor of Farinacci's car was still running, but the other two agents had him next to their car when Sutton arrived. The car belonging to Rivero and defendant were blocking traffic and people had started honking their horns and screaming. Pursuant to agent Rivero's instructions, Mr. Sutton drove away in Mr. Farinacci's car, following the other FBI car in which Rivero and Balingieri held defendant in custody.

*Agent Balingieri:*

Q. When Mr. Walker (government's attorney) asked you if you had no intention of searching Mr. Farinacci's car, it was because you were not looking for contraband or drugs or anything else when you arrested Mr. Farinacci, correct?

A. Yes, sir.

Q. Your only purpose was to execute the warrant for his arrest as a material witness, correct?

A. Yes, sir. (July 22, 1982 hearing; TR. p. 147.)

*Agent Sutton:*

Q. What was the reason for the issuance of the warrant of arrest according to the knowledge that you had?

A. Hearsay second hand. It was a warrant of arrest for being a material witness in a bank robbery matter.

Q. A material witness in a bank robbery matter?

A. Right.

Q. Or was it a material witness to appear before a grand jury?

A. I am not even sure of that.

Q. You don't know?

A. No.

Q. But, it was a warrant of arrest as a material witness, correct?

A. As I was aware, yes.

Q. Of that you are sure?

A. Yes.

Q. I ask you if based on your previous answer, you were under the impression or not that Mr. Farinacci was a target of a bank robbery investigation?

A. I wouldn't characterize it as a target. Just a subject of an investigation.

Q. But, he was a subject of the investigation. I ask you because you felt that he was the subject of the investigation because you were under the impression that he was a suspect, of being a participant in a bank robbery; is that correct?

A. I am really not that familiar with the case. I just knew that there was an outstanding warrant for him as a material witness. The details, the case was not mine. I wasn't that familiar with the case.

Q. So, all you knew that day was that there was a material witness warrant against Mr. Farinacci, but it was not to your knowledge that he might have been a target or a suspect of that bank robbery; correct?

A. Right. (July 22, 1982 hearing; TR. 10–11.)

Q. When you first got in that car, did you know of any criminal offense that Mr. Farinacci had committed at that point? I am talking about as far as being in the automobile.

A. Other than he was wanted as a material witness, no. I was not aware of any criminal offense. (July 22, 1982 hearing; TR. 74.)

At the suppression hearing the agents gave different descriptions of the circumstances they encountered after placing defendant under custody. Although he was under their control, agent Rivero felt the situation was not. According to his testimony, this was so because people from a housing project across the street began yelling: "Farinacci, what's happening? Do you need help?" According to his version, defendant replied: "Call my attorney." Agent Balingieri stated that drivers were blowing their horns because one lane was blocked off and he heard one guy yelling from the housing project: "Farinacci, what is wrong with you? Do you need any help? Do you want me to call someone?" To this, according to Balingieri, defendant responded: "Call the union and say that I was arrested." (July 22, 1982 hearing, Balingieri's testimony, Transcript p. 135.) Agent Sutton, the last one to arrive, gave a somewhat lengthier account of the arrest setting. He testified that horns were honking and people screaming; that somebody yelled "fink, fink" and that he thinks he heard someone yell—Farinacci.[2] Further on he categorically said that somebody did yell: "Farinacci!"[3] He asserted that he felt threatened, although not by Mr. Farinacci, and that no one approached the agents or the defendant, no one tried to reach defendant's vehicle, throw stones or in any manner impede his driving defendant's car away.[4]

The record reveals that defendant's arrest was executed quickly and that his car was moved away from the arrest scene immediately thereafter. Other than yelling from a distance, no one approached either defendant or the agents nor obstructed the arrest. Both agents' cars sped away. Defendant was taken in one of them by agents Rivero and Balingieri. Agent Sutton followed them in defendant's Datsun. When he got in the car he inadvertently saw the butt and hammer of a weapon protruding two or three inches from an accordion-like leather briefcase with two pouches on the passenger's seat. Other than the weapon, the contents inside the briefcase were not visible to Sutton.[5] Upon observing the weapon he pulled it out, noticed that it was loaded and emptied it. There are two versions of what happened immediately thereafter. During the early part of his testimony,[6] he stated that he laid the weapon back down and looked at a black piece of cloth that was already partially out when he pulled out the weapon. He further indicated that "this piece of cloth came out," that he picked it up, put it back down, but by then they were starting to move and he dropped everything, set the car in gear, picked up the weapon and flashed it from his window to the other car where Rivero and Balingieri were with defendant. Upon arriving at Morel Campos Street to leave defendant's car at his mother-in-law's home, he put the weapon inside the hood and placed both items and the .45 magazine inside the briefcase. During cross-examination,[7] however, he declared that when he saw the weapon he pulled it out, noticed that the safety was off, dropped the round into his hand, put it into his shirt pocket "and then *I took the gun and just laid it on top of the briefcase, reached in, saw the piece of cloth.*" Asked again whether he reached in and pulled the piece of cloth, he answered affirmatively.

Upon arriving at Morel Street where he left defendant's car unguarded, agent Sutton pulled out documents from the briefcase and looked at them. He got into Rivero's car with the briefcase in his hand. While Rivero's car was parked in front of the home of defendant's mother-in-law waiting for agent Sutton to arrive, Mr. Balingieri asked defendant if the gun which had been

---

**2.** TR. p. 16 (Sutton's testimony).

**3.** TR. pp. 25, 74 (Sutton's testimony).

**4.** TR. pp. 81–82 (Sutton's testimony).

**5.** "When I got into the car and I observed the briefcase, I wasn't aware of the contents of the briefcase other than this metallic object extruding partially out of the briefcase." TR. p. 59.

**6.** TR. p. 31.

**7.** Sutton testimony, TR. pp. 61–62.

found in his car was his, if it was registered and if he had a permit. No *Miranda* warnings had been given at this point. Defendant admitted the gun was his and that he had no permit nor had he registered it.

Mr. Farinacci's automobile was left unguarded near the home of his mother-in-law. It was not searched during or after his arrest. All of the agents testified that they had no interest in seizing the car and no intention of searching it. They further clarified that the only purpose in arresting defendant was to secure his appearance as a material witness and that they were not looking for contraband nor was he wanted at that time for the commission of any criminal offense.

This is the factual background that developed during the evidentiary hearing held before the Magistrate on the matter of defendant's suppression claim. In his report, the Magistrate recommended that all items seized during the warrantless search, except for the handgun which was in plain view, be excluded since they do not fall within any of the recognized exceptions to the warrant requirement rule. In its appeal, the government urges that the warrantless search and subsequent seizure of defendant's briefcase was justified under any one or a combination of the well-established exceptions to the search warrant requirement. Thus, the government raised all the possible exceptions which have at one time or another been discussed by the Supreme Court and federal case law. In this endeavor, it attempts to fit the search in any and all of the recognized exceptions and, in doing so, leaps from one exception to another, sometimes stretching the facts beyond the real circumstances disclosed by the testimonial evidence on record. Another flaw in the government's position on appeal consists in focusing the Fourth Amendment problem raised in this case as one in which the absence of a warrant is the rule instead of the exception.

As stated in *Mincey v. Arizona,* 437 U.S. 385, 389, 98 S.Ct. 2408, 2411; 57 L.Ed.2d 290 (1978) quoting from *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19

L.Ed.2d 576: "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions....'" (citations omitted). And in *Chimel v. California,* 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969) Justice Stewart pointed out that "the general requirement that a search warrant be obtained is not lightly to be dispensed with, 'and the burden is on those seeking [an] exemption [from the requirement] to show the need for it....'" (Quoting from *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59.)

For purposes of clarity, we shall discuss each of the justifications raised by the government separately, and treat independently the handgun from the other items of evidence—hood and documents—which were inside the briefcase and not within plain view.

### Incident to Arrest Exception

The Magistrate determined that the search of the briefcase was not incident to defendant's lawful arrest. The government relies heavily on the recent case of *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) in support of its claim that the incident to arrest exception plainly justifies this search. A careful reading of *Belton* shows that the prior cases dealing with the incident to arrest exception were neither disregarded nor erased by it. The *Chimel* decision completely reexamined and marked the proper extent of the "search incident to arrest" doctrine. The essential principles established in *Chimel* in defining the scope of this type of search are set out in the opinion:

When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety

might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence. *Chimel,* 89 S.Ct. at p. 2040.

The Court warned that "[n]o consideration relevant to the Fourth Amendment suggests any point of rational limitation, once the search is allowed to go beyond the area from which the person arrested might obtain weapons or evidentiary items" and thus, [t]he only reasoned distinction is one between a search of the person arrested and the area within his reach on the one hand and more extensive searches on the other." *Id.* at 766, 89 S.Ct. at 2041. These justifications had been previously recognized by the Court. They were equally rejected in situations in which the search could not be characterized as incident or contemporaneous to the arrest. To this effect, the Court in *Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964), cited with approval in *Chambers v. Maroney,* 399 U.S. 42 at 48, 90 S.Ct. 1975 at 1979, 26 L.Ed.2d 419 (1970), concluded that "these justifications are absent where a search is remote in time or place from the arrest [since] [o]nce an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." The factor of contem-

poraneity is tied to the exigency of the circumstances. Thus, a search at a later time or place does not involve the justifications spelled out in *Chimel* in terms of exigency, such as the possibility of endangering the officer's safety by reaching for a gun in the area within the arrestee's control, flight or the destruction or concealment of evidence, again within the arrestee's reach. Precisely because of this, *Belton* does not govern our search. There the search took place at the time and scene of the arrest along with other exigent circumstances.[8] Quoting from *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 the Court recognized that " 'the exigencies of the situation' may sometimes make exemption from the warrant requirement imperative." 101 S.Ct. 2862. The Court in *Belton,* specifically stated, that its holding did no more than determine the meaning of *Chimel's* principles and that it in no way altered "the fundamental principles established in the *Chimel* case regarding the basic scope of searches incident to lawful custodial arrests." *Id.* 2864, note 3. This basic scope of searches incident to arrest established in *Chimel* was applied by the Court in *Belton* upon introducing its "bright-line" rule that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest search the passenger compartment of that automobile." *Id.,* 2864. Viewing its holding in light of *Chimel's* definition of the limits of the area that may be searched, the Court pointed out that: "It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is *within reach of the arrestee,* so also will containers in it be *within his reach." Id.* (Emphasis ours). In *Belton,* the *Chadwick*[9] case was pointed out as an example of a search which is not incident to the arrest. *Id.,* 2865. In *Chadwick,* the search was conducted more

---

8. The arrest took place in an open highway, by one officer who took four defendants under custody in close proximity to the automobile.

9. *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

than an hour after the agent had exclusive control of the footlocker and long after respondents were securely in custody which led the Court to conclude that it could not "be viewed as incidental to the arrest or as justified by any other exigency." 433 U.S., at 15, 97 S.Ct. at 2485.

█ Contrary to the circumstances present in *Belton* which justified the incident to arrest exception, the search conducted in our case by agent Sutton was neither made at the time nor at the place of the arrest. The arresting agents' own testimony compels this conclusion. At the time the search was made Mr. Farinacci was riding in the back seat of the other FBI car, accompanied by two agents and his hands were handcuffed behind him. Agent Sutton followed in Mr. Farinacci's car. Before driving away he had already checked to see if there was another person in the car. When agent Sutton reached and searched inside the briefcase, then discovering the hood and papers therein, he had already driven away from the scene of the arrest and was in complete control of Mr. Farinacci's car. Neither at the precise moment of the search nor at any time thereafter did Mr. Farinacci have access or possibility of gaining access to his vehicle or the briefcase located therein. The government has tried to bring in circumstances such as the fact that people were honking their horns and screaming because of the blocked traffic, that defendant was called by his name and asked if he wanted to call someone and that people were yelling "fink, fink" as circumstances which were present at the time of the search. Even assuming that this were so, the agents admitted that Mr. Farinacci offered no resistance to his arrest, no outsider approached him or the agents during the time the arrest was being conducted and no one impeded either agent Sutton or the other agents from driving away from the scene. Furthermore, the yelling and the honking occurred before the search was conducted. This was not an "on the spot" search, but one which took place in a setting isolated from all the circumstances

characterized by the government as exigent, at a time in which agent Sutton, by himself and having sole control and custody of Mr. Farinacci's car, drove it along the highway. This search was simply not incident to Mr. Farinacci's arrest and, therefore, the search and seizure of the hood and papers inside defendant's briefcase were not justified under this exception.[10]

### The Automobile Exception

█ The second exception invoked by the government is that originally set forth in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 and reaffirmed and defined in *United States v. Ross,* —— U.S. ——, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) providing that "a warrantless search of an automobile stopped by police officers who had probable cause to believe the vehicle contained contraband was not unreasonable within the meaning of the Fourth Amendment." *Ross,* —— U.S. at ——, 102 S.Ct. at 2159 of the opinion. In *Ross,* the Court defined the scope of the search that is permissible and held that "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.,* at p. ——, 102 S.Ct. at 2172.

In order to fully understand the holding in *Ross,* we must consider the prior cases of *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) and *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) which are fully analyzed in the plurality opinion. In *Chadwick,* the Court of Appeals for our Circuit upheld the suppression of marihuana found inside a footlocker, holding that even though the footlocker had been properly taken into custody and despite the fact that there was probable cause to believe that the footlocker contained a controlled substance when searched, probable cause alone was insufficient to sustain the warrantless search. It also found that the search was

---

10. This would be equally applicable to the handgun. In view of our ruling on this particu-

lar item of evidence, however, it is not included in the discussion of this exception.

not justified under the automobile exception or as a search incident to an arrest. On certiorari, the Supreme Court upheld the appellate decision. In distinguishing the diminished privacy of an automobile from that of luggage, the Court observed that "[u]nlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects." 433 U.S., at 11, 97 S.Ct. at 2483. In *Sanders,* the Court confronted the issue of the constitutionality of a warrantless search of luggage taken from an automobile lawfully stopped. Granting that the police had probable cause to believe that the suitcase contained marihuana and that it was being driven away in the taxi, the Court concluded that "the police were justified in stopping the vehicle, searching it on the spot, and seizing the suitcase they suspected contained contraband." 442 U.S., at 761, 99 S.Ct., at 2591. Conceding this, the only question before the Court then was "whether the police, rather than immediately searching the suitcase without a warrant, should have taken it, along with respondent, to the police station and there obtained a warrant for the search." *Id.* Observing that in *Chadwick* it had refused to extend the *Carroll* exception to all searches of luggage, the Court concluded that the state had failed to meet its burden of showing the need for a warrantless search of luggage properly taken from an automobile and specifically noted that: "We ... find no justification for the extension of *Carroll* and its progeny to the warrantless search of one's personal luggage merely because it was located in an automobile lawfully stopped by the police." *Id.,* at p. 765, 99 S.Ct., at p. 2593.

In *Ross,* the Court rejected that part of the reasoning in *Sanders* on which the plurality opinion had relied upon in *Robbins v. California,* 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), but otherwise adhered to its holding in that case. Adopting the distinction made by Chief Justice Burger in his concurrent opinion in *Sanders,* the Court expressly differentiated between the situation in which the agent's suspicion falls upon a particular container or luggage, but

he has no probable cause to search the arrestee's entire vehicle, from that in which probable cause justifies the search of the whole vehicle which in turn justifies the search of every part of the vehicle and its contents. In adopting this distinction, at page ——, 102 S.Ct. at page 2166 of the opinion in *Ross,* the Court quoted that part of Chief Justice Burger's concurrent opinion in *Sanders* which reads:

Here, as in *Chadwick,* it was the *luggage* being transported by respondent at the time of the arrest, not the automobile in which it was being carried, that was the suspected locus of the contraband. The relationship between the automobile and the contraband was purely coincidental, as in *Chadwick.* The fact that the suitcase was resting in the trunk of the automobile at the time of respondent's arrest does not turn this into an 'automobile' exception case. The court need say no more.

At page ——, 102 S.Ct. at page 2168 of its opinion in *Ross,* the Court further stated:

Unlike *Chadwick* and *Sanders,* in this case police officers had probable cause to search respondent's entire vehicle.

And, at page ——, 102 S.Ct. at page 2167, it noted:

It is clear, however, that in neither *Chadwick* nor *Sanders* did the police have probable cause to search the vehicle or anything within it, except the footlocker in the former case and the green suitcase in the latter.

Thus, when the agent's suspicion is confined to a particular piece of luggage and there is no probable cause for him to search the defendant's entire vehicle, the principles of *Chadwick* and *Sanders* govern the situation. In the particular facts of our case the motive for defendant's arrest was to compel him to appear as a material witness before a grand jury. The agents themselves testified during the suppression hearing that Mr. Farinacci was not sought for the commission of a crime nor did they have any suspicion that the car driven by him was being used to transport contraband or that

at the time of the arrest it was an instrument in the commission of a crime. The agents did not search Mr. Farinacci's car either during or after his arrest. Moreover, they expressed that they had no interest either in seizing or searching the vehicle. This is corroborated by the fact that after they had sole custody and control over the automobile they left it unguarded at the home of Mr. Farinacci's mother-in-law. Agent Sutton's suspicion fell solely upon the briefcase after inadvertently discovering that the butt of a handgun protruded approximately two or three inches from it. By this time defendant had been handcuffed and was being held under custody in another car being driven by FBI agents. While the agent was driving Mr. Farinacci's car, he searched inside the briefcase and seized its contents which were not in plain view, without a warrant.[11] After leaving defendant's car at Morel Campos Street, agent Sutton transferred the briefcase to the second FBI car and thereafter to headquarters.

The record thus shows that the agents had no probable cause to search the vehicle, that they harbored no suspicion as to it and had no interest in searching it. Agent Sutton's suspicion was focused solely on the attaché case due to the presence of the visible handgun protruding from it a few inches. In these circumstances, the determination of the reasonableness of this warrantless search, according to the reasoning in *Ross,* must be made pursuant to the principles of *Chadwick* and *Sanders.* Following the principles of these two cases, the warrantless search of the items found inside the briefcase was not justified under the automobile exception.

*Partially Opened Container*

The government contends that Mr. Farinacci had no expectancy of privacy in his briefcase since it was partially opened. In *Ross,* the Court observed that: "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." In *Sanders,* *supra,* note 13, 99 S.Ct., at p. 2593, the Court recognized that not all containers and packages found during a search deserve Fourth Amendment protection since those whose contents can be inferred from their outward appearance or whose contents are otherwise in plain view can be searched without a warrant. In the present case, the briefcase searched was in fact the repository for the personal effects of a person known to the arresting agents to be a lawyer and the contents of said briefcase were not opened to plain view. Neither did the outward appearance of the briefcase destroy defendant's reasonable expectation of privacy in it since its contents could not be inferred from it. Furthermore, the same was closed by a zipper which had been partially drawn only to the extent that the gun protruded from it two or three inches. Nothing inside the case was visible or accessible to an observer, unless he actually opened it, reached in, and rummaged through its contents.[12] In these circumstances, the fact that the briefcase was opened a few inches is irrelevant and does not destroy Mr. Farinacci's expectation of privacy in it. Were the government's reasoning followed, any handbag, briefcase, suitcase or other piece of personal luggage customarily destined to serve as a repository for personal effects would lose its privacy characteristics by the mere fact that it happened to be partially opened, even if its contents are not in plain view. The protec-

11. Agent Sutton gave two conflicting versions as to the search and seizure of the hood. The first one being that, upon pulling the handgun, the hood came out and the second one that, after he took the gun out and placed it on top of the briefcase, he reached in and saw the piece of cloth which turned out to be a hood. Accordingly, having reviewed agent Sutton's explicit statement that after he had the gun in his possession he reached in, saw the piece of cloth that turned out to be a hood and then pulled it out, we adopt the second version as the more credible one.

12. As stated earlier in this opinion, agent Sutton testified during the suppression hearing that when he got into defendant's car and observed his briefcase he wasn't aware of the contents of the briefcase other than the metallic object extruding partially from it.

tions afforded by the Fourth Amendment cannot be swallowed by chance or by excuses which serve only to further erode its history and its purpose.

### Plain View

■ The claim that the items within the briefcase lost their Fourth Amendment protection because the case was partially opened being a corollary of the broader exception of plain view, we deem it convenient to further explore this justification advanced by the government in further detail. In *United States v. Irizarry,* 673 F.2d 554, 560 (1st Cir.1982), our Circuit observed that "where an officer's presence is limited to a particular justification or purpose, what is in plain view is restricted to what could be inadvertently seen when his movements are made pursuant to that purpose" and that, although it need not analyze what could actually have been in the officer's mind, "movements clearly outside the scope of its mandate cannot be termed inadvertent." As noted earlier, none of the items located within the briefcase were within the scope of agent Sutton's plain view when he conducted the search. As to both categories of these items, he expressly testified that he reached within the briefcase, saw them and pulled them out. Having previously discussed the circumstances surrounding the hood, we turn now to those relevant to the documents themselves. There were multiple documents inside the lawyer's briefcase whose contents were not apparent to the agent until he glanced through and read them. Although the government opposes the suppression of all the documents seized from the briefcase, it has concentrated its attention on two documents which, in its opinion, contain incriminating evidence and has urged the Court in its reconsideration motion to read them in order to determine their incriminating content. The Court understands that it need not do so since the government's discovery of the allegedly incriminating contents of the document was not inadvertent, but rather the result of a deliberate examination of them. As expressed by our Circuit in the case of *United States v. Weber,* 668 F.2d 552 (1st

Cir.1981), "while there have been many opinions as to what is in plain view, where, as here, the government's burden is to show that the discovery was inadvertent, discovery of contents by rummaging among a pile of papers is not inadvertent unless the rummaging itself was initially justified." As in *Weber,* the documents here were seized wholesale and not as a result of the inadvertent discovery or as a result of inadvertent observation of its plain view contents. The situation before us is similar to that of *United States v. Scios,* 590 F.2d 956 (D.C.Cir.1978) in which the agent bent over, read through folders, and fingered them so that their labels could be read. In the case of *United States v. Jackson,* 576 F.2d 749, 753 (8th Cir.1978) the Court stated:

> Although the file drawer and the briefcase that the agent seized were perhaps in plain view, the contents of each were not. The plain view doctrine does not authorize search and seizure of items contained within objects like attaché cases, file cabinets and luggage that are themselves in plain view. A plain view seizure is limited to items that are clearly incriminating and that are inadvertently encountered in the course of a justifiable intrusion. It cannot be used as justification for rummaging through file cabinets, even with probable cause to believe that incriminating evidence lies within. (Citations omitted.)

The government having failed to meet its burden of showing that the hood and the contents of the documents were exposed and in plain view, the warrantless search cannot be justified under the plain view exception. It has also failed to show that the search of such evidence was justified by any exigent circumstances since at the moment of the search Mr. Farinacci was securely held in custody in another FBI car and agent Sutton who conducted the search had exclusive control and possession of the briefcase and its entire contents.

The circumstances surrounding the search and subsequent seizure of the hood and the documents, however, are different from those which were present when agent Sut-

ton inadvertently came upon the weapon protruding from the briefcase. The evidence on record convincingly shows that, although the items inside the briefcase were not, the handgun was actually within the officer's plain view and accessible to him.

### Dangerous Instrumentality/Hot Pursuit Exceptions

The government has also justified the warrantless search under the hot pursuit and dangerous instrumentality exceptions. Both of these exceptions are manifestations of the existence of exigent circumstances which would justify a warrantless search. As observed by Justice Fortas in his concurring opinion in *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 310, 87 S.Ct. 1642, 1652, 18 L.Ed.2d 782 (1967), in referring to searches made incident to a lawful arrest and in the course of hot pursuit:

> But searches under each of these exceptions have, until today, been confined to those essential to fulfill the purpose of the exception: that is, we have refused to permit use of articles the seizure of which could not be strictly tied to and justified by the exigencies which excuse the warrantless search. The use in evidence of weapons seized in a 'hot pursuit' search or search incident to arrest satisfies this criterion because of the need to protect the arresting officers from weapons to which the suspect might resort.

As we have previously seen, neither the hood nor the documents inside the briefcase were seized in a hot pursuit search. The pursuit of Mr. Farinacci had ceased when the search was made and the search was not conducted until he was securely held in custody in another car. As to those cases cited by the government which have upheld searches in which a dangerous instrumentality was suspected, the same are inapplicable to the situation before us for the simple reason that there is no evidence on record which would show that the agent had reason to believe that the briefcase contained explosives or other inherently dangerous items which would justify their opening it at once.

In sum, having considered the totality of the circumstances surrounding the warrantless search, the Court understands that the government has not shown that the search and seizure, other than that involving the weapon, were justified under any of the exceptions to the warrant requirement. The record neither speaks of exigent circumstances nor of reasonableness of the search. It portrays, instead, normal circumstances of an ordinary material witness arrest which in no way suggest that the agents could not have reasonably obtained a warrant for the search of the briefcase involved. What this record does reveal as to the search of the only item on which the agents focused their suspicion is exactly what the Fourth Amendment protects against: That the inferences which men may draw from evidence not be drawn by the officer engaged in the often competitive enterprise of ferreting out crime but by a neutral and detached magistrate. *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

We are well aware of the rules established recently in *Belton* and *Ross.* Our prior analysis of these cases and of the circumstances and controlling principles in this action has been made conscious of the fact that differences in factual situations must be seriously taken into account in determining Fourth Amendment rights. As admonished by Chief Justice Burger in his concurring opinion in *Sanders, supra,* 99 S.Ct., at 2595, "there are risks in formulating constitutional rules broader than required by the facts to which they are applied." Neither *Belton* nor *Ross* encourage departure from this wise restriction. Accordingly, the well-reasoned and careful scrutiny set forth by Magistrate Castellanos in his Report and Recommendation is adopted by this Court after a thorough review of the entire transcript. The motion to suppress is therefore, GRANTED as to the hood and documents seized. It is DENIED as to the weapon itself.

### Incriminating Statements Made Before Miranda Warnings

Magistrate Castellanos found that the statements elicited from Mr. Farinacci

at the time that he was being held by the arresting officers were made as a result of custodial interrogation, and, thus he recommended that the incriminating statements then made concerning the ownership, permit and registration of the weapon be suppressed. Mr. Farinacci has been charged in the Commonwealth courts for unlawful possession of a firearm. The agents' alleged belief that they did not know that their questions would reasonably elicit an incriminating answer is in conflict with agent Sutton's action upon discovering the weapon. If discovery of the gun was both routine and insignificant, as claimed, it is hard to understand why Mr. Sutton flashed the weapon from his car to the other agents signaling discovery of incriminating evidence. Furthermore, although the answers to the inquiry as to the existence of a license to carry the weapon and its registration could have been in the affirmative they certainly could just as well have been negative. The agents could reasonably expect an incriminating answer to their questions. As aptly phrased by the government's attorney during argument at the suppression hearing, pursuant to defendant's answers to his questions the agent found that a crime had been committed.[13]

The government's contention that, because Mr. Farinacci is a lawyer who is necessarily cognizant of his rights, the absence of *Miranda* warnings prior to custodial interrogation may somehow be excused has no support in constitutional case law. No consideration relevant to the constitutional protection against self-incrimination suggests any deviation based on distinct groups or classes of individuals who have knowledge of the law. The protection exists for all. It does not in any manner depend on the extent of the knowledge or notice of the state of the law that an individual may possess. Such a limitation could, indeed, lead to absurd and arbitrary distinctions.

Accordingly, the Motion to Suppress the incriminating statements made by defendant concerning the handgun is GRANTED.

SO ORDERED.

13. See transcript of July 22, 1982 hearing, at p. 145.